**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| ANGELA MARIE KING, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 25-1017-KHV |
| | ) | |
| KOCH AG & ENERGY | ) | |
| SOLUTIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

On January 29, 2025, Angela Marie King filed suit against her former employer, Koch AG & Energy Solutions, LLC ("KAES"), alleging that in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 et seq., defendant subjected her to a hostile work environment (Count I), disparate treatment on the basis of sex (Count II) and retaliation (Count III). See Amended Complaint (Doc. #12) filed May 1, 2025. Plaintiff also alleges that defendant violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) (Count IV). Id. This matter is before the Court on Defendant Koch AG & Energy Solutions, LLC's Motion For Summary Judgment (Doc. #64) filed February 12, 2026. For reasons stated below, the Court sustains defendant's motion in part.

**Summary Judgment Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at

248.  A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51.  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.

## Factual Background

Summarized, the following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

KAES provides solutions to the global agriculture, energy and chemical markets by producing, marketing and distributing products such as fertilizers, methanol, natural gas and crop

performance technologies. In December of 2018, King began working for KAES as a Finance Leader for its plant in Fort Dodge, Iowa. Prior to joining KAES, King had worked in other finance and accounting roles for approximately five years. She holds a Bachelor of Science in Accounting and a Master of Business Administration with an emphasis in accounting.

While at Fort Dodge, King worked with Travis Lane during the 2022 turnaround.[1] Lane exhibited dismissive, condescending and bullying behavior toward not only King, but also other female KAES employees. King was not the only female KAES employee to notice Lane's behavior. Rebecca Fox, another Fort Dodge employee, observed Lane's negative behavior toward King and other female KAES employees whenever they spoke up or challenged Lane's ideas.

In October of 2022, KAES hired King as the Project Controls Transformation Leader in Wichita, Kansas. In her new role, King reported to Burton Tredway. King's base salary in her new role was $125,000—the same base pay she had earned as Fort Dodge site Finance Leader. KAES evaluates whether to increase an individual's base compensation based on factors such as an increase or change in responsibilities. In evaluating the pay for King's new role, Tredway did not consider the pay of his other Direct Reports because he did not consider their roles, responsibilities and expectations ("RREs") to be similar to plaintiff's. Tredway testified that King's compensation did not change when she transitioned to her new role because KAES wanted to "prove out" that King would not cause "distractions" from a "personnel standpoint" before KAES would "start making compensation adjustments." King's "personnel" issues stemmed from complaints of gender disparity she had made at Fort Dodge. Tredway testified that King's success in her new role would be determined by what she was able to transform. Tredway bet that King

---

[1] A turnaround is a planned period when plants are shut down for maintenance, inspection, repair and upgrade activities that require extensive advance planning and coordination, with significant cost.

would be successful if she did not make complaints similar to those that she had previously made regarding gender disparity. If King was successful in her role, she would have the opportunity to earn Incentive Compensation ("I-Comp").

During the transition to her new role, King asked Tredway for a base pay increase. Tredway denied her request and explained that she was moving from a site-specific role to a fleet-wide role, and she would have "a lot of opportunity for salary to move up because [King's] responsibilities [were] more in line with the results of the entire company versus just one specific site." In late 2022, Tredway increased Lane's base pay by $15,000 even though Lane had established a pattern of overspending.

Shortly after King arrived in Wichita to begin her new role, the behavior that King had observed by Lane in 2022 started to recur. Lane exhibited dismissive, demeaning and condescending behavior toward King such as (1) openly laughing at her ideas, (2) undermining her work to other KAES employees by stating that he did not know about King's "data stuff" despite King providing weekly written updates of her workstreams and holding weekly meetings to discuss her initiatives, (3) demanding that King present her work product to him for approval before presenting it to others, (4) excluding King from key meetings with the team, (5) holding out King's work product as his own or without crediting King, (6) interfering with King's ability to utilize support staff, (7) claiming that he "spoke for" King and (8) becoming aggressive in tone and posture with King. Lane's behavior occurred nearly every day between January of 2023 and the end of King's employment in February of 2024, and it intensified with time. In one instance, one of Lane's female subordinates informed King that Lane had attended a meeting and presented King's work product as his own, and that Lane had phrased it as "this was the work of what he had been directing." King did not observe Lane exhibit similar behavior toward male KAES

employees.  King complained to Tredway both generally about the team dynamics and more specifically about Lane's behavior.

In September of 2023, the mounting tension between King and Lane prompted Tredway to hold meetings with each of them, where Tredway asked each of them what he or she would do differently if he based their compensation on their ability to work collaboratively with one another. Tredway did not present this question to Lane in a threatening or critical manner.  On the other hand, he presented the question to King in a frustrated and exasperated manner that clearly communicated that her salary was at risk.  Tredway testified that he asked the question because collaboration between the two was essential as "[Lane] owned the project controls capability [a]nd [King's] job was to do transformation in there."

On October 30, 2023, King sent Tredway an email stating that she was dissatisfied with the "underlying tension on the team."  Though her email did not mention sex discrimination "in those exact terms," she stated that she had dealt with the "same type" of tension in Fort Dodge, where Tredway was aware that she had complained of gender disparity.

Following King's email of October 30, Tredway began holding weekly meetings with King and Lane.  During several of these meetings, Lane continued to undermine King's work product and question King why she had not sought his approval of certain work product prior to the meetings.  During a one-on-one meeting with Tredway, King again raised the issue of not receiving the necessary support that she had been requesting, to which Tredway immediately and abruptly stated, "if we can't figure this out, I am going to have to make some changes," impliedly threatening King's employment.  Lane does not have any memory of Tredway making this same statement to him.

On January 12, 2024, during a meeting between King, Lane and Tredway, Lane became

aggressive and hostile in tone, posture and demeanor toward King for not seeking his approval on her work product (which she was under no obligation to do). Tredway did not take any action to cease Lane's behavior.

At the time King reported to Tredway, Tredway had other direct reports besides Lane— Ken Dayton, Kevin Whitson, Dana Jacobs and Allison Dellinger ("direct reports")—that led specific departments or "capabilities." These capabilities included Project Controls, Turnarounds, Project Management, Document Controls and Procurement. Rick Reisner (whom Dayton replaced in September of 2023), also reported directly to Tredway. As their supervisor, Tredway was responsible for supervising each of his direct reports and reviewing their RREs to ensure that their job duties aligned with his expectations.

While KAES employed King as Project Controls Transformation Leader, it employed Lane as Project Controls Leader. Since 2012, a Koch subsidiary had employed Lane in various leader and manager roles, and in 2017, Koch placed Lane into the Project Controls Leader position. Some of his duties included assisting in the development and deployment of Project Controls training, coaching and mentoring on estimating, scheduling, cost forecasting, change management, risk management and performance reporting as well as mentoring and developing other KAES employees for leadership opportunities. In 2023, Lane's total compensation was $253,745, and his I-Comp award was $40,000. When asked if Tredway had explained to Lane the considerations underlying his 2023 I-Comp award, the only talking points that Lane could remember were that he did not make a major contribution in 2023 like he had in 2022 (at the Fort Dodge turnaround) and that business was down.

While KAES employed King as Project Controls Transformation Leader, it employed Dana Jacobs as Turnaround Services Leader. A Koch subsidiary had employed Jacobs since 2015,

and in 2023, he became KAES Turnaround Services Leader.  At any given time, Jacobs was responsible for leading three to 12 individuals.  Jacobs was responsible for leading the turnaround capability team, operating facilities that supported turnaround work, developing his team, supporting seven operating facilities across the fleet and managing small and large capital projects as well as mentoring and developing employees in his department.

While KAES employed King as Project Controls Transformation Leader, it employed Kevin Whitson as Engineering Systems & Records Leader.   A Koch subsidiary had employed Whitson since July of 2011, and in 2022, he became Engineering System & Records Leader.  As of 2023, Whitson had between five and seven direct reports, and his organization consisted of approximately 12 people.  In his role, Whitson supervised, led and mentored the Engineering Systems & Records team and led KAES-wide engineering systems and records capabilities by monitoring business needs against team resources and exploring technical and development opportunities to share across the organization.   In 2023, Whitson's total compensation was $165,000, and his I-Comp award was $25,000.

While KAES employed King as Project Controls Transformation Leader, it employed Rick Reisner as a Project Manager Leader.  A Koch subsidiary had employed Reisner since 2014, and in 2022, he came under Tredway's supervision as a Project Manager Leader.  As Project Management Leader, Reisner managed and leveraged resources to support business growth— particularly for plant expansions—by ensuring projects were properly staffed and timely completed, leveraged capability models for multiple plants and turnovers, served as a high-level strategic leader and led more than 96 capital projects in various phases while developing other team leads.  He was also responsible for developing and mentoring talent within his department. In 2023, his total compensation was $227,363.50.   In 2023, KAES terminated Reisner's

employment due to performance issues, so he did not receive an I-Comp award for that year.  In 2023, despite his performance issues, KAES paid Reisner approximately $67,363.50 more than it paid King.

While KAES employed King as Project Controls Transformation Leader, it employed Ken Dayton as a Project Management Leader.  A Koch subsidiary employed Dayton since 1977, and in September of 2023, he transitioned from Construction Management Leader to KAES Project Management Leader, becoming Tredway's direct report.  During his time as Tredway's direct report, Dayton had approximately six to eight direct reports.  In 2023, Dayton's total compensation was $412,956.70, and his I-Comp award was $150,000.00.

While KAES employed King as Project Controls Transformation Leader, it employed Allison Dellinger as Senior Procurement Manager.  Since August of 2019 Dellinger has led between four to six direct reports and a team of 13 people within her department, which she was responsible for mentoring and developing.  Dellinger led KAES's procurement contracting capability.  In 2023, Dellinger's total compensation was $175,000, and her I-Comp award was $50,000.

King's role was different from Tredway's other direct reports because King did not "own" an entire capability or have any direct reports.  Tredway's direct reports had different professional and educational experiences than King.  As demonstrated by their RREs and based on the evaluation by Tredway (who was responsible for supervising their roles and evaluating their performance), each of Tredway's direct reports had unique skills, duties, supervision expectations and responsibilities.  While Tredway's direct reports, including King, were responsible for aligning with KAES strategy in ways they saw fit, setting the pace of their work stream, had a high level of autonomy and were responsible for influencing other KAES employees to buy into KAES culture,

King's responsibilities, freedom and autonomy were different from Tredway's other direct reports. King had a discrete responsibility within specific business problems whereas Tredway's other direct reports owned entire capabilities. While Tredway's direct reports did not have the authority to demand or assign tasks to King, they were the decision makers on the projects King supported, e.g., businesses processes within Lane's Project Controls Department.

Tredway expected that in her new role, King would identify a subset of improvement opportunities that KAES was looking for, especially within the Project Controls capability. Tredway expected King and his other direct reports to collaborate to understand their unique and distinct RREs in supporting KAES projects and turnarounds and evaluate how to implement data tools to help transform those processes to achieve better efficiency, reduce costs, manage risk, achieve better use of resources and deliver better business results overall. Tredway created King's role to have a position solely focused on transforming and improving those specific responsibilities because his other direct reports were so busy doing the day-to-day and rolling from "event to event to event" that they did not have time to dedicate to those projects and transformations.

In her role, Tredway expected King to collaborate with his direct reports to give them the data processes to ensure successful business results. Tredway believed that King had to treat his direct reports, especially Lane and his team, as her customers, because her main focus was to transform the Project Controls systems for which Lane was responsible.

In the fall of 2023, King drafted RREs for her role as Project Controls Transformation Leader, which was consistent with Tredway's understanding and expectation of the role. King's RREs describe several aspects of her role, including "driving transformation," "strategic decision making," "influential leadership to optimize organizational performance," "capability development," among many other responsibilities and expectations. King's responsibilities

included effectively managing and communicating organizational changes resulting from prioritized initiatives and transferring knowledge. King's self-drafted RREs include references to "influential leadership to optimize organizational performance," "encourag[ing] a culture of innovation & learning throughout the cross-functional teams," "using influential leadership to reduce sense of unease," "utiliz[ing] comparative advantage to build capability throughout organization," "transferring knowledge that enables more of the team to quickly identify gaps in analyses" and "deliver[ing] superior results through transformation (people, process, and technology)." King's RREs did not include specific references to leading or managing direct reports, or recruiting or developing KAES employees for leadership roles.

In creating King's role, Tredway intended for her to be an individual contributor, meaning that she would not supervise an entire department or any direct reports. King had no authority to assign projects to Tredway's direct reports or to direct resources under the supervision of Tredway's other direct reports without their input. Once King had transitioned into her role as Project Controls Transformation Leader, King realized that she needed direct reports to support her initiatives and be successful in her position. King repeatedly asked that Tredway assign her support resources as he had for her male colleagues. Tredway did not permanently assign any direct reports to King on a full-time basis. Instead, individuals were "assigned to help [King] with her initiative." When King tried to use the support staff that Tredway had assigned to help, Lane repeatedly blocked King's efforts to do so. King brought this issue to Tredway's attention. On May 4, 2023, after King had raised the issue on numerous occasions, King emailed Tredway formally requesting that he assign support staff to her initiatives, mentioning that she was being excluded from ongoing strategy conversations and expressing that Lane was meeting her directions with conflict.

All of Tredway's direct reports worked out of KAES headquarters in Wichita in an office environment, held standard business hours and generally worked under the same office working conditions.  When King relocated to Wichita, Tredway gave her an office on the third floor and a first floor cubicle in the middle of the Project Controls group.  During King's entire period of employment as the Project Controls Transformation Leader, each of Tredway's male direct reports had offices on the first floor in close physical proximity to Tredway.  Treadway did not give King or Dellinger (Tredway's other female direct report) offices on the first floor with their male colleagues.  As of Tredway's deposition in November of 2025, Dellinger was the only member of Tredway's non-remote direct reports who did not have an office on the first floor.

Tredway testified that he gave King a cubicle on the first floor so she could observe what was going on, have a better understanding of what people were working on and struggling with and support collaboration.  Tredway did not expect any of his male direct reports to work in cubicles amid their subordinates to "support collaboration."  King's office on the third floor gave her more privacy, so she would not be distracted by the day-to-day operations and could focus on transforming processes when she was not collaborating with the Project Controls group.  An office on the first floor would have provided the same level of privacy as the third floor without interfering with King's participation in key conversations among her male colleagues—all of whom occupied offices within close physical proximity of each other on the first floor.

Leading up to the Dodge City turnaround, which occurred in August of 2023, one of King's primary objectives was to roll out the forecasting model that she had been working on for Dodge City—a model that identified and predicted areas where sites were forecasted to overspend during turnarounds and aimed at reducing overspending.  King designed the forecasting model to help Tredway and his direct reports understand what they might utilize during a turnaround by

evaluating each turnaround's wage rate for laborers, anticipated rental equipment, materials and supplies to prevent as much overspending as possible. Tredway's team, site turnaround teams, operations teams and other KAES employees expressed concerns that they did not have enough detail about what King was working on, such as King's forecasting model, and how that would ultimately affect their teams. Prior to the turnaround, King went to the Dodge City site and presented the forecasting findings and expressly identified several areas where she predicted overspending. Even though King's forecasting model properly and accurately forecasted the information above, the male site leadership consciously chose not to heed King's advice and did not make the necessary adjustments to prevent overspending. Tredway testified that if the Dodge City site leadership had followed King's forecast, it would have saved KAES millions of dollars. Before the 2023 Dodge City turnaround, King addressed a known a gap in planning and led the effort to close said gap—effort that should have fallen under the responsibility of Jacobs, but did not, because Jacobs did not have the skillset to address it—and successfully avoided the costs associated with the planning issues, which created a value of approximately one million dollars to KAES.

During King's employment, KAES utilized an incentive compensation program called I-Comp. I-Comp is a form of variable pay that considers company earnings and an individual's contributions for that year, specifically the business results the individual impacts. As part of its compensation philosophy, KAES warns against treating variable compensation as an entitlement or guarantee based on title, position, a performance rating or company performance, or anchoring to previous variable pay amounts to make a current recommendation—because KAES resets the default to zero. For 2022, based on her contribution to the Fort Dodge site that year, King received $65,000 in I-Comp. King had stepped up and taken on additional responsibilities of the Planning

capability and had developed positive results there.  King's I-Comp was down 15 per cent over the 2021 company results, but for other employees at the Fort Dodge site, it was down 50 to 70 per cent.  Without her strong performance at the Fort Dodge site, King's 2022 I-Comp award would have been down closer to the 50 per cent amount that her Fort Dodge peers received.

For 2023, King received $35,000 in I-Comp.  On November 30, 2023, Tredway notified King of the amount and explained that it was lower than 2022 because business results were down 40 per cent.  Tredway testified that King's I-Comp award was lower in 2023 due to business results being down 40 per cent and the fact that the 2023 Dodge City turnaround did not get good business results.  When business results are down, the amount of money available for I-Comp decreases, so I-Comp awards in general will also be down, though under KAES compensation philosophy, an employee's individual contributions can outweigh the impact of down business results for purposes of I-Comp.  When evaluating I-Comp awards for 2023, Tredway noted that while his direct reports all contributed to business results of the company, data tools such as the forecasting model that King was working on were still in the "theory stage."

In 2023, except for Dana Jacobs, each of Tredway's direct reports had a lower I-Comp award than in 2022 for the same reason which Tredway gave to King—business results were down. The reductions ranged from zero to 46 per cent, with King's reduction being the largest.  Dana Jacobs' 2023 I-Comp was in recognition of his individual contributions and impact to KAES, specifically his ability to collaborate well within KAES as it was preparing to integrate an entirely new capability and build a team.  In 2023, Jacobs' total compensation was $369,928, and his I-Comp award was $80,000.  In 2023, Jacobs also received the lowest percentage reduction—zero per cent reduction from 2022—in his I-Comp award and the second highest total compensation behind Dayton, despite the fact that Jacobs was the Turnaround Leader and Tredway testified that

Jacobs' turnaround initiatives would not have impacted the 2023 Dodge City turnaround, which was the only turnaround that occurred in 2023.

In the Pretrial Order, King compares herself to "the highest paid similarly situated male colleague paid in 2023" which would be Dayton. King also identifies Lane, Whitson and Reisner as comparators. Dayton received a lower 2023 I-Comp award compared to his 2022 I-Comp award. Dayton's 2023 I-Comp award was higher than King's because Tredway believed that Dayton and his team of 20 individuals were making significant contributions to KAES. Dayton had accountability for nearly half a billion dollars to spend on capital projects, including several large expansion projects, which explained the difference in his 2023 I-Comp award compared to Tredway's other direct reports, including King. The I-Comp awards for Lane and King were reduced by equal dollar amounts, and approximately 40 per cent lower, in comparison to the previous year.

Individual performance of Tredway's direct reports, which would later become the basis for I-Comp awards, was first discussed in June of 2023, and specific I-Comp amounts were decided by October 29, 2023. Tredway provided specific input on what King and his direct reports were working on that would merit an I-Comp award and in some circumstances, a higher award than other individuals. By October 29, 2023, KAES had finalized the amounts for I-Comp awards, and it did not change the awards before communicating them to employees in November of 2023.

On February 4, 2024, King made a report on KAES's GuideLine Portal. In the GuideLine Report, King alleged that she had been subjected to ongoing unlawful harassment and discrimination based on her sex. During KAES's investigation, Chelsea Creech, HR Specialist, investigated King's allegations of sex discrimination, specifically how she believed she was treated differently because of her sex and her belief that she received a pay decrease because of her sex.

During Creech's interview with Justin Klooz, HR Director, Klooz informed Creech that King had been open about her frustrations with Lane, and that King had formerly raised issues of gender equality to Sommers.

During Creech's investigation, Creech interviewed Jordan Stiger, one of Lane's female subordinates. King had been training Stiger on use of King's headcount model. In the investigation, Stiger informed Creech that she had offered a solution to an issue concerning King's headcount model but Lane and Tredway "brushed [her] to the side." Stiger also informed Creech that Lane acted unprofessional, "bulldozed" into a meeting and talked "at" Stiger and made her cry. Stiger further stated that she did not think Lane was a good leader and that she thought Lane lacked leadership skills. Stiger described the conversation with Lane as belittling and condescending, and she expressed that she had received feedback from Lane that she was opinionated and emotional, but Stiger felt like she observed Lane "do the same things." Stiger stated, "If I do something its disrespectful but if [Lane] does it its not disrespectful." At the conclusion of the interview, Stiger asked Creech to ensure that Lane would not find out what she had disclosed in her interview. Despite Stiger's comments, Creech's final investigatory report makes a single reference to Stiger—only listing her as an individual who was interviewed and nothing further.

In her report on the GuideLine Portal on February 4, 2024, King also reported that she believed that KAES did not decrease any male's pay and provided names of peers that she believed had similar RREs. One such peer was Mike Hammons, Operations Capability Transformation Leader, though he did not report to Tredway. Like Tredway's direct reports, Hammons's I-Comp in 2023 was lower than his I-Comp award in 2022. This was due to business results but also because in 2023, Hammons was in a new transformation role like King. Hammons' 2023 I-Comp

award was $35,000 more than King's, bringing Hammons' total 2023 compensation to $236,639.50 in comparison to King's $160,000. KAES determined that Hammons's role was not comparable and ultimately determined that King's role had no comparators, though King controverts this determination.

King alleges that her email on October 30, 2023 informed Tredway that she believed Lane was discriminating against her because of her sex. In her deposition, King admitted that her email to Tredway that day acknowledged "tension and toxicity" but did not complain that these issues were attributed to her sex. King had been vocal about issues of gender disparity during her time at Fort Dodge, however—and Tredway was aware of that fact. King's email referenced the tension she experienced at Fort Dodge and stated that she was dealing with the same thing now. King never expressly complained to Tredway that the "tension and toxicity" were attributed to her sex, and she never reported in "direct terms" to Tredway that she thought Lane was discriminating against her because of sex.

King alleges that in November of 2023, she informed Klooz that she believed she was being discriminated against because she was a woman and alleges that she documented that in her handwritten notes. When asked in her deposition to point out such statements or observations in her notes, King admitted that they were not there. King stated, "The part that I have starred. I didn't write the actual words in here, because I was still bringing this notebook to work everyday and I was concerned about it being found and people having this access. But I said to Justin [Klooz] I was being treated differently, because I'm a woman." During her conversation with Klooz, King also expressed concerns about team dynamics and that she "believed she was being treated differently because [she] was a woman." King's notes indicate that she expressly named Lane and Jacobs, expressed Jacobs' "aggravation" toward King, stated she was being treated

differently and stated that the team dynamic was "not ok—that needs to be fixed."

King also informed Klooz that her male peers had informed her that they did not "get" her work, and they did not understand this "data stuff" (the data models she had created). Tredway testified that King's male peers did not need to understand the data in order to do their jobs. In King's notes describing her meeting with Klooz, she listed her job satisfaction level as seven (on a scale of one to ten) and stated that she really liked what she did, but the "team dynamic is not ok and needs to be fixed." Tredway never reported to Klooz that King had raised concerns regarding sex discrimination or retaliation to him or to any other employee.

On February 15, 2024, without notice, King resigned from her employment. Her resignation letter stated that she had been subjected to ongoing harassment and discrimination based on gender. King's notes state that as early as December 7, 2023, she was looking for a new position. On January 30, 2024, prior to her resignation, King received and accepted an offer to work at Monolith Materials as the Director of Operations Accounting earning a salary of $225,000. On February 20, 2024, King began her employment with Monolith.

On June 11, 2024, King dual-filed a complaint with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission. King's attorney drafted and signed the charge. In the charge, King alleged that her variable compensation (I-Comp) had been decreased from $60,000 to $35,000 due to business results being down. King alleged that she discovered that her variable compensation was the only one to decrease and that her male colleagues did not receive a similar decrease in their variable compensation.

King's charge does not allege discrimination regarding her base compensation or her total compensation. The charge did not include any specific allegations that King had engaged in protected activity before she resigned, but it referenced King's requests to Tredway regarding lack

of resource assignments, King's email to Tredway dated October 30, 2023, the one-on-one meeting with Tredway that was a follow-up discussion to King's email and that King "suffered retaliation after expressing dissatisfaction related to the workplace environment."  King's charge did not set forth any allegations explicitly related to a claim for hostile work environment, but it referenced Tredway's comment threatening King's employment, that King's male peers received the necessary resources to perform their jobs while she did not, that Tredway required King (and not male colleagues) to provide a working level of detail and that KAES failed to take any meaningful action in response to King's reports.

On multiple occasions during their employment with KAES, both Tredway and Lane underwent trainings for Respect in the Workplace.  King testified that as a result of her time working at KAES, she has lost career opportunities, that "it was hell every day," that it negatively impacted her life and finances, that she missed doing things with her daughter because of her time in Wichita, and that if she "had to do it again, [she] would never have accepted that role."

**Analysis**

Plaintiff asserts that in violation of Title VII and the KAAD, defendant subjected her to a hostile work environment (Count One), disparate treatment based on sex (Count Two) and retaliation (Count Three).[2]  She also asserts that defendant violated the EPA (Count Four). Defendant seeks summary judgment, arguing that (1) plaintiff's failure to exhaust administrative remedies bars some of her claims, (2) plaintiff cannot articulate a prima facie case of hostile work environment, (3) plaintiff cannot articulate a prima facie case of sex discrimination, (4) plaintiff

---

[2]        Plaintiff asserts identical claims under both Title VII and the KAAD.   Because the same standards and burdens apply to claims under Title VII and the KAAD, the Court's analysis applies to both claims.  See Watson v. City of Topeka, 241 F. Supp. 2d 1223, 1230 (D. Kan. 2002) (hostile work environment); Singh v. Cordle, 936 F.3d 1022, 1042 (10th Cir. 2019) (retaliation).

cannot articulate a prima facie case of retaliation, (5) plaintiff cannot show that defendant's articulated reasons for its actions are pretextual, (6) plaintiff cannot articulate a prima facie case of constructive discharge, (7) plaintiff cannot articulate a prima facie EPA claim and (8) plaintiff cannot recover punitive damages.

## I.    Exhaustion Of Administrative Remedies

Defendant argues that plaintiff failed to exhaust administrative remedies for (1) her claim for damages related to compensation other than I-Comp, (2) her hostile work environment claim and (3) her assertion that she engaged in protected activity prior to February 4, 2024.  As a result, defendant asserts that these claims are barred.[3]

Under Title VII, if plaintiff fails to timely file an EEOC charge regarding each discrete employment incident or adverse action, defendant may raise an affirmative defense of failure to exhaust.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018).  To exhaust, plaintiff generally must present her claims to the EEOC or authorized state agency and receive a right-to-sue letter based on that charge.  Id. at 1181.  In Kansas, plaintiff must file an administrative charge within 300 days of the alleged discriminatory action.  See 42 U.S.C. § 2000e-5(e)(1).  The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b).  The exhaustion requirement serves to (1) give notice of the alleged violation to the charged party and (2) give the EEOC an opportunity to conciliate the claim.  Smith v. Cheyenne Ret. Invs. L.P., 904 F.3d 1159, 1164 (10th Cir. 2018).  Courts liberally construe plaintiff's

---

[3]    In response, plaintiff argues that her GuideLine Report and resignation letter placed KAES on notice of her claims.  In determining whether defendant is entitled to the affirmative defense of failure to exhaust administrative remedies, however, the Court looks to plaintiff's charge, not to her internal complaints.

allegations in the EEOC charge, but the charge must still "contain facts concerning the discriminatory and retaliatory actions underlying each claim." Id. The ultimate question is whether "the conduct alleged in the lawsuit would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made in the EEOC charge." Id.

A.      Compensation Other Than I-Comp

In addition to backpay related to I-Comp, plaintiff seeks backpay related to base pay. Defendant argues that plaintiff's charge is silent as to any discrimination in base salary and focuses only on I-Comp, so it provided no notice that her discrimination claim encompassed other compensation. Plaintiff responds that (1) KAES' compensation philosophy is total compensation for total contribution, and any impact to plaintiff's variable compensation impacts her total compensation, and (2) KAES' response explains that its incentive compensation program aligns employees' total compensation, including base and variable pay, and expressly references plaintiff's base salary.

Though the charge mentions plaintiff's base salary, it includes no indication that plaintiff believed that her base salary was discriminatory. The charge states only that her *variable* compensation was decreased and that her male colleagues did not receive similar decreases in their *variable* compensation. Regardless of KAES compensation philosophy, the charge did not give the EEOC or KAES notice of plaintiff claims that her *base* compensation was discriminatory. Plaintiff's claim that her base salary is discriminatory does not fall within the scope of an investigation which would "reasonably grow out of" her claim that she received a decrease in variable compensation while male colleagues did not. See Smith, 904 F.3d at 1164. Plaintiff therefore failed to exhaust administrative remedies on her claim for damages related to compensation other than I-Comp.

Accordingly, the Court sustains defendant's motion for summary judgment on this issue.[4]

B.      Hostile Work Environment

Plaintiff asserts that she experienced harassment based on sex that resulted in a hostile work environment when Lane (1) repeatedly questioned plaintiff's involvement in certain meetings and initiatives, (2) questioned plaintiff's experience in front of other KAES employees, (3) stated to other KAES employees that he spoke for plaintiff, (4) refused to allocate support from his subordinates to assist with plaintiff's initiatives, (5) credited himself for plaintiff's work product to other KAES employees, (6) criticized plaintiff's input and ideas directly to her and in front of other KAES employees, (7) excluded plaintiff from key meetings, (8) mischaracterized data issues as being the fault of plaintiff, (9) became aggressive in tone and posture toward plaintiff, (10) expressed frustration that plaintiff had not obtained his approval on her work product and (11) generally undermined plaintiff's work.  She claims that the hostile work environment also occurred when Tredway (1) refused to take meaningful action to stop Lane's behavior and instead became ultra-critical of plaintiff's work product, (2) implied that plaintiff's salary would be impacted if she did not "get along" with Lane, (3) threatened to terminate plaintiff's employment, (4) required that plaintiff's work product be at a working-level of detail while not demanding the same of Lane and (5) reduced plaintiff's total compensation for 2023 to an amount lower than similarly situated male colleagues.

Defendant argues that plaintiff's charge is devoid of allegations which support a claim for

_____

[4]      This does not impact plaintiff's EPA claim, because the EPA has no administrative exhaustion requirement.  Washington Cnty. v. Gunther, 452 U.S. 161, 175 (1981) ("the Equal Pay Act, unlike Title VII, has no requirement of filing administrative complaints and awaiting administrative conciliation efforts").

hostile work environment. Plaintiff responds that the following allegations in her charge support a claim for hostile work environment: (1) Tredway threatening plaintiff's employment if she could not figure out the support staff issue, (2) Tredway providing plaintiff's male peers the necessary resources to perform their jobs while not providing the same to her, (3) Tredway requiring plaintiff to provide a working level of detail while not requiring the same of her male colleagues and (4) KAES failing to take any meaningful action in response to plaintiff's complaints.

Plaintiff's charge mentions that Tredway (1) threatened her employment, (2) did not provide her the same resources as he did her male colleagues and (3) required her to provide a higher working level of detail than her male colleagues. Though the charge does not explicitly mention Lane, an investigation into plaintiff's allegations about Tredway would reasonably grow to include Lane, especially because Tredway threatened plaintiff's employment because she could not get along with Lane and plaintiff had complained to Tredway about Lane interfering with her use of resources. See Smith, 904 F.3d at 1164. Thus, plaintiff exhausted her administrative resources with respect to her hostile work environment claim.

Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's hostile work environment claim.

### C.     Protected Activity Prior To February 4, 2024

Defendant argues that plaintiff's charge does not allege that prior to her Guideline Report dated February 4, 2024, she made reports of discrimination or retaliation, so plaintiff cannot assert that she engaged in protected activity before that date. Plaintiff responds that her charge referenced (1) the several requests that she made to Tredway regarding lack of resource assignments, (2) her email to Tredway dated October 30, 2023 and (3) the one-on-one meeting with Tredway which was a follow-up to her email.

Plaintiff's charge states that on October 30, 2023, she emailed Tredway "addressing that she still had not received the resource assignments from the project controls team."  The charge also states that plaintiff's "male peers receive direct reports regularly in addition to receiving additional direct reports to help with their projects."  The charge does not explicitly state the content of plaintiff's email, but an investigation would reveal that plaintiff's email referenced the "same type" of problems that she had experienced at Fort Dodge, which Tredway would have understood to mean gender disparity problems.  Thus, the email implied that plaintiff was not receiving resource assignments due to her sex (and thus constituted protected activity).  This falls within the scope of an investigation which would "reasonably grow out of" the allegations in her charge.  See id.

Accordingly, the Court overrules defendant's motion for summary judgment for failure to exhaust plaintiff's claims that she engaged in protected activity prior to February 4, 2024.

## II.     Hostile Work Environment

Count One asserts that in violation of Title VII and the KAAD, defendant subjected plaintiff to unlawful sexual harassment which created a hostile work environment.  Defendant argues that plaintiff cannot establish a prima facie case of hostile work environment because the behavior she complains of (1) is not severe or pervasive and (2) is not related to her sex.  Plaintiff responded that she experienced years of dismissive, condescending, bullying and chauvinistic behavior from Lane which occurred nearly daily and interfered with her ability to perform her job, and that Tredway took no action to cease Lane's behavior and instead began treating plaintiff poorly.  Plaintiff further responds that Lane did not exhibit these behaviors toward male employees.

To establish a prima facie case for a hostile work environment, plaintiff must prove that

(1) she is a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on the protected group and (4) the harassment was so severe or pervasive that it altered a term, condition or privilege of employment. Semsroth v. City of Wichita, 304 Fed. App'x. 707, 721 (10th Cir. 2008). A hostile work environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). "An employer creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Iweha v. State of Kan., 121 F.4th 1208, 1221 (10th Cir. 2024). Plaintiff must prove that her work environment was both subjectively and objectively hostile. Throupe v. Univ. of Denver, 988 F.3d 1243, 1252 (10th Cir. 2021). To make this determination, the Court looks at the totality of the circumstances and considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Whether a hostile work environment exists "is not, and by its nature cannot be, a mathematically precise test." Id. at 22. Rather, it "depends not only on the number of incidents, but also on the severity of the incidents." Tademy v. Union Pac. Corp., 614 F.3d 1132, 1143 (10th Cir. 2008). Whether a work environment is hostile is disjunctive—pervasiveness and severity are independent and equal grounds on which plaintiff can support her hostile work environment claim. Lounds v. Lincare, Inc., 812 F.3d 1208, 1222 (10th Cir. 2015).

Viewing it in the light most favorable to plaintiff, the record reflects that Lane (1) repeatedly questioned plaintiff's involvement in certain meetings and initiatives, (2) questioned

plaintiff's expertise in front of other KAES employees, (3) stated to other KAES employees that he "spoke for" plaintiff, (4) refused to allocate support from his subordinates to assist with plaintiff's initiatives, (5) credited himself for plaintiff's work product to other KAES employees, (6) criticized plaintiff's input and ideas directly to her and in front of other KAES employees, (7) excluded plaintiff from key meetings, (8) mischaracterized data issues as being the fault of plaintiff, (9) became aggressive in tone and posture toward plaintiff, (10) expressed frustration that plaintiff had not obtained Lane's approval on her work product and (11) generally undermined plaintiff's work. The record reflects that Tredway (1) took zero action to cease Lane's behavior and, instead, (2) began treating plaintiff poorly, (3) threatening her salary, (4) threatening her employment, (5) holding her accountable for the discriminatory and chauvinistic behaviors of the Dodge City leadership who consciously chose not to follow her accurate forecasting and (6) decreased plaintiff's I-Comp.

None of Lane or Tredway's actions are sufficiently severe to support a claim for hostile work environment. See Morris v. City of Colo. Springs, 666 F.3d 654, 667 (10th Cir. 2012) (conduct must be "especially egregious or extreme" to be severe enough to survive summary judgment). A genuine issue of material fact exists, however, as to whether the conduct was pervasive. Plaintiff asserts that she experienced Lane's bullying nearly every day for years.

The record reflects a genuine issue of material fact whether Lane's behavior was because of plaintiff's sex. Rebecca Fox, who worked closely with plaintiff and Lane, observed Lane exhibit "dismissive, condescending, and bullying demeanor toward King and other female KAES employees, particularly when female employees spoke up or presented challenges to Lane's ideas," and she "did not observe Lane exhibit this type of behavior toward other male employees, regardless of their level of leadership." A reasonable jury could view Lane's behavior as the

-25-

embodiment of chauvinistic behavior that women often face in the workplace. Genuine issues of material fact exist whether Lane's treatment of plaintiff created a hostile work environment and whether Tredway—knowing as much—failed to make it stop.

Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's hostile work environment claim.

## III.    Disparate Treatment

Count Two asserts that in violation of Title VII and the KAAD, defendant subjected her to unlawful discrimination based on sex when (1) defendant paid her less than her similarly situated male colleagues[5] and (2) Lane, with the knowledge and consent of Tredway, treated her less favorably than her male colleagues, which ultimately resulted in her constructive discharge. Defendant argues that plaintiff cannot (1) establish a prima facie case of sex discrimination because she cannot show that defendant treated her less favorably than male employees or (2) show that its proffered legitimate reasons for its actions are pretextual.

To establish a prima facie case of sex discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she suffered some harm with respect to an identifiable term or condition of employment; (3) she was qualified for her position; and (4) defendant treated her less favorably than others not in her protected class. Muldrow v. City of St. Louis, Mo., 601 U.S. 346, 355 (2024); McNellis v. Douglas Cnty. Sch. Dist., 116 F.4th 1122, 1139 (10th Cir. 2024). After plaintiff presents a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions, and finally shifts back to plaintiff to show that the employer's articulated reasons are pretextual. Walkingstick Dixon v. Oklahoma

---

[5]    As discussed above, plaintiff failed to exhaust her administrative resources on any Title VII claim regarding compensation other than I-Comp, so the Court focuses its analysis only on I-Comp and ignores plaintiff's claims regarding base compensation.

ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents, 125 F.4th 1321, 1334 (10th Cir. 2025) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

A.    Whether Plaintiff Can Establish A Prima Facie Case Of Sex Discrimination

Plaintiff asserts that she experienced disparate treatment due to sex when (1) defendant paid her less I-Comp than similarly situated male colleagues and (2) Lane, with Tredway's knowledge, treated her less favorably than her similarly situated male colleagues, which ultimately resulted in her constructive discharge.

Defendant does not dispute that as a woman, plaintiff is a member of a protected class, or that she is qualified for her position. With respect to plaintiff's I-Comp claim, receiving less variable compensation caused harm to an identifiable term or condition of plaintiff's employment—her compensation. The record reflects that almost all of plaintiff's male colleagues received decreased I-Comp in 2023, but plaintiff received the largest reduction. By reducing plaintiff's I-Comp more than that of her male colleagues, KAES treated plaintiff less favorably. Thus, plaintiff has established a prima facie case of sex discrimination based on reduced I-Comp.

With respect to Lane's treatment of plaintiff, his actions affected multiple terms and conditions of her employment. For example, Lane refused to provide plaintiff the support she needed to perform in her role and excluded her from important meetings, which affected her ability to perform her job. The record reflects that Lane did not interfere with the work of male colleagues, and thus he treated them more favorably. The record also reflects that Tredway was aware of Lane's behavior and did nothing to stop it. See Vance v. Ball State Univ., 570 U.S. 421, 427 (2013) (employer liable for sexual harassment if knew or should have known about it but failed to take remedial action). Thus, plaintiff has established a prima facie case of sex discrimination with respect to Lane treating her less favorably than male colleagues.

B.        Whether Plaintiff Can Establish Pretext

For purposes of summary judgment, plaintiff has established a prima facie case of sex discrimination.   The burden therefore shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision.  Defendant does not offer a legitimate, non-discriminatory reason for Lane treating plaintiff less favorably than male colleagues, so this claim remains for trial.  With respect to I-Comp, defendant claims that it reduced plaintiff's I-Comp because business was down 40 per cent from 2022.

Because defendant has offered a non-discriminatory reason for the I-Comp award, plaintiff must establish that defendant's offered legitimate reason was not the true reason for its decision but rather was pretext.  See Trujillo v. PacifiCorp, 524 F.3d 1149, 1154–55 (10th Cir. 2008).  To defeat summary judgment, plaintiff's burden is to demonstrate a genuine issue of material fact whether the proffered reason is unworthy of belief.  Id. at 1158.  Plaintiff can show pretext by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reason for its action such that a reasonable factfinder could rationally find it unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reason.  Walkingstick, 125 F.4th at 1337.  The Court does not ask whether the employer's proffered reason was wise, fair or correct, but only whether the employer honestly believed the reason and acted in good faith on those beliefs.  Debord v. Mercy Health Sys. of Kan., Inc., 737 F.3d 642, 655 (10th Cir. 2013).

Here, plaintiff argues that defendant's stated reason for reducing her I-Comp is pretextual because (1) Tredway admitted that he took into account the Dodge 2023 turnaround when determining plaintiff's I-Comp award and (2) the stated justification for each of Tredway's other

direct reports is nonsensical. Plaintiff does not address defendant's claim that it reduced her I-Comp because business was down 40 per cent. The record reflects that though plaintiff received the largest reduction in her I-Comp, all except one of her male colleagues also received a reduction. Further, the fact that Tredway considered the Dodge 2023 turnaround does not make defendant's proffered legitimate business reason unworthy of belief, because the turnaround impacted business results. Thus, plaintiff has not established a genuine issue of material fact whether defendant's claim that it reduced her I-Comp because business was down 40 per cent is pretext for unlawful sex discrimination.

Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's disparate treatment claim based on I-Comp. Plaintiff's disparate treatment claim based on Lane treating her less favorably than male colleagues remains.

## IV.    Retaliation

Count Three asserts that in violation of Title VII and KAAD, defendant retaliated against her for engaging in protected activity when Tredway (1) did not take appropriate action to stop Lane's behavior after she complained, (2) refused to provide plaintiff the support staff she requested despite providing support staff to Lane, (3) required that plaintiff's work product be at a working-level of detail while not demanding the same of plaintiff's similarly situated male colleagues, (4) forced plaintiff to continue working alongside Lane, (5) threatened plaintiff's employment and salary if she could not "get along" with Lane and (6) reduced plaintiff's total compensation for 2023 contributions to an amount lower than similarly situated male colleagues, which ultimately resulted in her constructive discharge.

Where plaintiff seeks to establish a retaliation claim through indirect or circumstantial evidence, the burden-shifting framework of McDonnell Douglas applies. Pinkerton v. Colo. Dep't

of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009). Once plaintiff has demonstrated a prima facie case, the burden shifts to defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004). If defendant articulates legitimate reasons for the action, plaintiff must demonstrate that the asserted reasons were pretextual. Id.

To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection exists between her protected activity and the adverse action. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018); Mauldin v. Driscoll, 136 F.4th 984, 995 (10th Cir. 2025).

Defendant argues that plaintiff cannot establish a prima facie case of retaliation because (1) her email to Tredway on October 30 did not expressly claim that the "tension and toxicity" was attributable to sex, (2) "in those exact terms," plaintiff did not complain to Tredway that she was being treated differently due to her sex, (3) the unfair treatment which plaintiff complains of (denial of resources and that her work be at working level of detail) were simply part of her role and (4) plaintiff's conversation with Klooz in November of 2023 did not include concerns or reports that she was being discriminated against because of sex. Defendant further argues that even if plaintiff's email dated October 30 constituted protected activity, she cannot establish that she suffered a materially adverse action as a result of such activity because KAES had determined her I-Comp award by October 29, 2023, and did not change the award before communicating it to plaintiff in November of 2023.

Plaintiff responds that numerous times between May and October of 2023, she complained to Tredway about team dynamics and Lane's behavior. Plaintiff argues that defendant's asserted reason for reducing her I-Comp is pretextual because Tredway admitted that he considered the 2023 Dodge Turnaround in determining plaintiff's I-Comp award and that in light of that fact, KAES' alleged justifications for all of Tredway's direct reports' 2023 compensation is nonsensical.

As to protected activity, the record does not reveal any specific instances of protected activity prior to October 30, 2023. Plaintif's email, however, refers to problems at Fort Dodge which were gender related, so though the record does not reveal the specific dates, plaintiff must have complained, and Tredway thought that plaintiff had "personnel" issues because of it. Viewing the record in the light most favorable to plaintiff, a genuine issue of material fact exists whether her email to Tredway dated October 30, 2023 constitutes protected activity. The email complains of the "same type of tension" with her team that plaintiff had experienced at Fort Dodge. Tredway was aware of plaintiff's issues of gender disparity during her time at Fort Dodge, so Tredway likely knew and understood that her reference to "the same type of tension" referred to gender disparity.

As to adverse employment action, while Muldrow altered the standard for Title VII discrimination claims, it distinguished adverse employment action in the context of Title VII retaliation claims. Muldrow, 601 U.S. at 357. Though the Supreme Court purported to lower the bar for adverse employment action in discrimination cases, it reaffirmed that in retaliation cases, plaintiff must still show that the retaliatory action caused a "significant" harm, i.e. the employer took action serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination. Id.; Burlington, 548 U.S. at 68. The Tenth Circuit has held that "a failure to

investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed" and thus cannot support a retaliation claim. Culp v. Remington of Montrose Golf Club, LLC, 133 F.4th 968, 977 (10th Cir. 2025) (quoting Daniels v. UPS, 701 F.3d 620, 640 (10th Cir. 2012)). Similarly, the Tenth Circuit also held that failing to transfer either the victim or the alleged harasser to different departments, i.e. forcing the victim to continue working alongside the alleged harasser, is not adverse employment action for purposes of a retaliation claim. Culp, 133 F.4th at 978.

Under Tenth Circuit precedent, Tredway failing to take appropriate action to cease Lane's behavior, forcing plaintiff to continue working alongside Lane and failing to provide plaintiff support staff do not constitute adverse employment action—those actions left plaintiff in no worse position than if she had not engaged in protected activity and thus would not discourage a reasonable employee from engaging in protected activity. Each of the following, however, could dissuade a reasonable worker from engaging in protected activity, Tredway (1) refusing to provide plaintiff support staff she was requesting while providing support staff to Lane, (2) requiring plaintiff's work product to be at a working-level of detail while not demanding the same of similarly situated male colleagues, (3) threatening plaintiff's employment and salary if she could not "get along" with Lane and (4) reducing plaintiff's total compensation for her 2023 contributions to an amount lower than her similarly situated male colleagues, which ultimately resulted in plaintiff's constructive discharge.

As to a causal connection, plaintiff may show a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982). Unless close temporal proximity exists between the protected activity and the retaliatory

conduct, plaintiff must offer additional evidence to establish causation. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). Generally, "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." Conroy v. Vilsack, 707 F.3d 1163, 1181 (10th Cir. 2013).

The record reflects that Tredway threatened plaintiff's salary in September of 2023, before plaintiff requested support staff in her email dated October 30, 2023. The record also shows that KAES determined plaintiff's I-Comp award by October 29, 2023, also before her email.[6] Because the record does not reveal dates of possible protected activity before October 30, the Court cannot infer causation based solely on proximity for these acts. Further, any complaints plaintiff made in Fort Dodge would have occurred outside of the proximity range which suggests causation.

The record does not reflect exactly when Tredway began requiring that plaintiff's work product be at a working-level of detail. Plaintiff asserts that instead of taking action to stop Lane's behavior, Tredway began treating plaintiff poorly. The record shows that at the one-on-one meeting closely following the email dated October 30, Tredway stated that if they could not figure out the support staff issue, he would make some changes, which plaintiff understood to threaten her employment. Thus, plaintiff has shown a genuine issue of material fact as to causation. Defendant does not proffer legitimate, nondiscriminatory reasons for Tredway requiring that plaintiff's work product be at a working-level of detail or threatening her employment. Thus, the Court need not analyze the issue of pretext.

---

[6]    As to I-Comp, even if a causal connection existed, as explained above, defendant offered a legitimate, nonretaliatory reason for awarding plaintiff $35,000 in I-Comp in 2023—business was down 40 per cent from 2022. As explained above, plaintiff has not shown that defendant's reason is pretextual.

Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's retaliation claim with respect to Tredway requiring that plaintiff's work product be at a working-level of detail and threatening her employment. The Court sustains defendant's motion for summary judgment on plaintiff's retaliation claim with respect to Tredway (1) failing to take appropriate action to stop Lane's behavior, (2) forcing plaintiff to continue working alongside Lane, (3) failing to grant plaintiff's request for support staff and (4) reducing plaintiff's I-Comp award.

## V.    Constructive Discharge

Plaintiff does not advance a free-standing claim for constructive discharge but alleges that on account of defendant's hostile work environment, disparate treatment and retaliation, she had no choice but to quit her job, i.e. defendant constructively discharged her. Defendant seeks summary judgment, asserting that plaintiff cannot prove that her working conditions were so intolerable that she had no choice but to quit.

Constructive discharge occurs "when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). The Court evaluates the voluntariness of an employee's resignation under an objective, totality of the circumstances standard. Id. at 1136. The employee's subjective views and the employer's intent are not relevant. EEOC v. PVNF, L.L.C., 487 F.3d 790, 805 (10th Cir. 2007). Showing that the employer's conduct meets the definition of "tangible employment action" or "adverse employment action" is "not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." Id. (quoting Hanh Ho Tran v. Trs. of the State Colls. in

Colo., 355 F.3d 1263, 1271 (10th Cir. 2004)); see Exum, 389 F.3d at 1135 (racial harassment and hostility "does not come close to demonstrating that [p]laintiff's resignation was objectively involuntary").  The question is not whether the resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign.  EEOC v. PVNF, 487 F.3d at 806.

Defendant asserts that plaintiff cannot establish a constructive discharge claim because (1) in November of 2023, she rated her job satisfaction as seven out of ten, (2) she only began searching for alternative employment in December of 2023, (3) she did not resign her employment until she had secured another job at a higher salary and (4) she continued to work for defendant for two weeks after she had secured her new job.  The facts that plaintiff secured a higher-paying job and gave defendant standard two-week notice do not definitively prevent her constructive discharge claim.  Plaintiff asserts that she endured bulling and discrimination for years and that her time at KAES "was hell every day."  Thus, even though she rated her job satisfaction seven out of ten at one time, viewing the record in light most favorable to plaintiff, a genuine issue of material fact exists whether she can establish a constructive discharge claim.

Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's constructive discharge claim.

## VI.    Equal Pay Act

Count Four alleges that defendant violated the EPA from January of 2023 through February of 2024 by failing to compensate her equally to male colleagues (Lane, Jacobs, Whitson, Reisner and Dayton) in the same establishment for equal work on jobs requiring substantially equal skill, effort and responsibility.  Plaintiff's EPA claim appears to encompass both I-Comp and total compensation.  Defendant seeks summary judgment, arguing that plaintiff cannot establish a prima

facie case.

The Equal Pay Act provides that "[n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  To establish a prima facie case under the EPA, plaintiff has the burden of proving that (1) she performed work which was substantially equal to that of male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the employee performed the work were basically the same; and (3) male employees were paid more under such circumstances.  Tidwell v. Ft. Howard Corp., 989 F.2d 406, 409 (10th Cir. 1993).  Once plaintiff establishes a prima facie case under the Equal Pay Act, the burden shifts to defendant to establish that a pay differential was premised on a factor other than sex.  Id.  To do this, defendant must show that the disparity is the result of (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a factor other than sex.  29 U.S.C. § 206(d)(1); Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1364 (10th Cir. 1997).

Defendant argues that plaintiff cannot establish a prima facie case that she was performing substantially equal work to Tredway's direct reports, because they (1) were responsible for mentoring and developing other KAES employees; (2) were responsible for direct results of their respective departments i.e., Project Controls, Construction, Procurement, etc. and (3) had direct reports that ranged from three to 20 individuals.  Defendant argues that in contrast, plaintiff was an individual contributor, had no direct reports, was not responsible for mentoring or developing

other KAES employees and was only responsible for discrete projects within the project controls department such as creating a forecasting tool.

Here, the record reflects that plaintiff received a larger reduction in 2023 I-Comp than Tredway's other direct reports and that plaintiff earned the lowest total compensation of Tredway's direct reports, so plaintiff can establish the third element—that KAES paid male colleagues more. The record also reflects that plaintiff and the other direct reports worked the same hours and in the same office conditions, so plaintiff can also establish the second element—that the conditions where the employee performed the work were basically the same.  Thus, whether plaintiff can establish a prima facie case under the EPA depends on whether she can establish the first element—that she performed work which was substantially equal to that of male employees considering the skills, duties, supervision, effort and responsibilities of the jobs.

Work is "substantially equal" if it "requires equal skill, effort, and responsibility."  Riser v. QEP Energy, 776 F.3d 1191, 1196 (10th Cir. 2015) (quoting 29 U.S.C. § 206(d)(1)).  In response to defendant's specific arguments about why her work was not equal to Tredway's other direct reports, plaintiff cites her declaration which states that "[a]lthough each of Tredway's direct reports were charged with different *aspects* of KAES projects, expansions, and turnarounds, each of Tredway's direct reports required the same level of visionary thinking, innovative problem solving, ability to maintain strong business relationships, building capability across KAES, among others."

"Such conclusory and self-serving statements, even if presented in an affidavit, are insufficient to create a genuine issue of fact to survive summary judgment."  Thomas v. U.S. Bureau of Prisons, 282 F. App'x 701, 704 (10th Cir. 2008).  Plaintiff also argues that "each of the direct report's RREs make some reference to utilizing/driving/leveraging comparative advantage,

being influential leaders, driving transformation within the team and more broadly across KAES, encouraging collaboration, knowledge sharing and constructive challenge, building cross-functionality across capabilities or disciplines, using or driving decision-making supported by data, building capability and developing other members of the team." The determination whether work is equal, however, turns on the actual content of the job, not a mere aspirational job description. Riser, 776 F.3d at 1196. Plaintiff's self-serving declaration and the job descriptions do not establish a genuine issue of material fact whether her work was substantially equal to that of Tredway's other direct reports. See id. (Tenth Circuit has consistently held jobs that are merely alike or comparable are not substantially equal).

Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's EPA claim.

## VII.    Punitive Damage Claim

Plaintiff seeks punitive damages. Defendant argues that the record contains no facts which support plaintiff's claim for punitive damages.

A Title VII plaintiff is entitled to punitive damages if her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." Zisumbo v. Ogden Reg'l Med. Ctr., 801 F.3d 1185, 1201 (10th Cir. 2015) (citing 42 U.S.C. § 1981a(b)(1)). "Malice" and "reckless indifference" require proof the employer acted "in the face of a perceived risk that its actions [would] violate federal law." Id. (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535–36 (1999)).

Here, the record reflects a genuine issue of material fact whether Tredway was aware of Lane's disparate treatment of plaintiff and did nothing to stop it and instead began treating plaintiff poorly. Such acts could show malice or reckless indifference to plaintiff's federally protected right

to be free of discrimination and retaliation based on sex.

Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's punitive damages claim.

**IT IS THEREFORE ORDERED** that Defendant Koch AG & Energy Solutions, LLC's Motion For Summary Judgment (Doc. #64) filed February 12, 2026 is **SUSTAINED in part. The Court sustains summary judgment in defendant's favor on (1) plaintiff's damage claims related to compensation other than I-Comp for failure to exhaust, (2) plaintiff's disparate treatment claim based on I-Comp (Count Two), (3) plaintiff's retaliation claim based on Tredway failing to take appropriate action to stop Lane's behavior (Count Three), (4) plaintiff's retaliation claim based on Tredway forcing plaintiff to continue working alongside Lane (Count Three), (5) plaintiff's retaliation claim based on Tredway not assigning plaintiff support staff (Count Three), (6) plaintiff's retaliation claim based on her 2023 I-Comp award (Count Three) and (7) plaintiff's EPA claim (Count Four).**

**Plaintiff's hostile work environment claim (Count One), disparate treatment claim based on Lane's treatment of her (Count Two), retaliation claim based on Tredway requiring that plaintiff's work product be at a working-level of detail (Count Three), retaliation claim based on Tredway threatening her employment (Count Three), constructive discharge claim and punitive damages claim remain for trial.**

Dated this 20th day of April, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge