**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | | |
|---|---|---|---|
| ANGELA MARIE KING, | ) | | |
| | ) | | |
| Plaintiff, | ) | CIVIL ACTION | |
| | ) | | |
| v. | ) | No. 25-1017-KHV | |
| | ) | | |
| KOCH AG & ENERGY | ) | | |
| SOLUTIONS, LLC, | ) | | |
| | ) | | |
| Defendant. | ) | | |
| | ) | | |

**MEMORANDUM AND ORDER**

On January 29, 2025, Angela Marie King filed suit against her former employer, Koch AG & Energy Solutions, LLC ("KAES"), alleging that in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Kansas Act Against Discrimination ("KAAD"), K.S.A. § 44-1001 et seq., defendant subjected her to a hostile work environment (Count One), disparate treatment on the basis of sex (Count Two) and retaliation (Count Three). See Amended Complaint (Doc. #12) filed May 1, 2025. Plaintiff also alleged that defendant violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) (Count Four). Id.

The Court granted summary judgment to defendant on some of plaintiff's claims. Memorandum And Order (Doc. #95) filed April 20, 2026. The following claims remained for trial: plaintiff's hostile work environment claim (Count One), a disparate treatment claim based on a co-worker's treatment of her (Count Two) and retaliation claims based on plaintiff's supervisor requiring that her work product be at a working-level of detail and threatening her employment (Count Three).[1] Beginning June 8, 2026, the Court held a three-day bench trial on these remaining

_____

[1] A claim for constructive discharge also remained, but plaintiff did not bring a free-
(continued. . . )

claims.  For reasons stated below, the Court finds in favor of defendant on all counts.

**Findings Of Fact**

KAES produces, markets and distributes products such as fertilizers, methanol, natural gas and crop performance technologies.  Its corporate headquarters are in Wichita, Kansas.  KAES has sites for fertilizer and methanol manufacturing throughout the United States.

KAES expects all employees to consult its principle-based management philosophy ("PBM") for decision-making and strategies, to guide behavior and decision-making within KAES for long-term success.  KAES expects employees to be knowledgeable about PBM and how to use it effectively in day-to-day decisions.  A key principle of PBM includes a "challenge process" in which employees must respectfully challenge ideas, proposals and data without regard to title or seniority.  This process is a core component of KAES's culture and operating philosophy.  Another key principle of PBM includes "knowledge sharing" in which employees openly share knowledge and perspectives to ensure that everyone learns something to adopt or avoid.

The KAES Code of Conduct for employees states as follows: "You must ask questions and/or raise concerns about any behavior that might violate our Principles, whether it involves a peer or your supervisor.  That requires courage."  A KAES policy titled "Asking Questions, Raising Concerns, and Getting Guidance," states the following: "We have a clear responsibility and must have the courage to ask questions and raise concerns about compliance or ethical behavior.  When we know of, or suspect, a possible violation you have a responsibility to report

---

[1] (. . .continued)
standing constructive discharge claim.  Amended Complaint (Doc. #12) filed May 1, 2025.  Rather, plaintiff alleged that because defendant constructively discharged her, she could recover post-resignation lost wages on Counts One through Three.  Because the Court finds for defendant on all claims, it need not address whether plaintiff may recover post-resignation damages under a theory of constructive discharge.

in good faith that information to your supervisor." Another KAES policy, titled "Options for Asking Questions, Raising Concerns, and Getting Guidance" lists the following contact options: immediate supervisor, any member of management, any local or corporate human resources ("HR") leader, any lawyer in legal or the GuideLine reporting system. The Code of Conduct prohibits discrimination, harassment and retaliation. Angela Marie King, Burton Tredway (her supervisor) and Travis Lane (a co-worker) all received training on the Code of Conduct and its policies.

In December of 2018, King began working as a Finance Leader at the KAES site in Fort Dodge, Iowa. In this role, she reported to Leslie Sommers, a female. During King's time there, she received overall positive feedback, and senior management repeatedly praised her value on company projects, including her collaboration skills.

At Fort Dodge, King also worked with the local site lab manager, Rebecca Fox, a female. Fox testified to King's leadership abilities at Fort Dodge, describing King as "very direct," stating that when King said something, people "knew what she meant," and that she was a "people leader," meaning that King was often out in the plant with operators and maintenance trying to build relationships and connections with others, instead of just sitting in her office.

While at Fort Dodge, King applied for but did not receive higher positions at KAES. King believed that KAES fostered an environment that unfairly benefitted male employees in hiring, promotion and recognition. More specifically, King was frustrated with Fort Dodge leadership not holding male underperformers accountable, not giving tough feedback to male underperformers and giving underperforming male employees undue credit, which led to better opportunities for them than those which King received. King expressed frustration to Sommers about unfair personnel decisions that favored male employees, ultimately informing Sommers that

-3-

she was questioning her career with KAES and considering resignation.  In response, Sommers cautioned King to not be seen as difficult or as the "squeaky wheel."

Due to King's frustrations, Sommers reached out to Tredway, a male, who was the Project and Procurement Director in Wichita, to see whether his team might have an opening to which King could bring value.  Sommers and Tredway discussed King's career trajectory and her frustrations with leadership.  For years prior to 2022, based on historical overspending and failure to complete projects like turnarounds in a timely and efficient manner, KAES had identified a problem in the Project Controls team, which Travis Lane, a male, led under Tredway's supervision.[2]

To address the inefficiency of Lane's Project Controls team, Tredway repurposed an open position and created the role of Project Controls Transformation Leader in Wichita.  In October of 2022, Tredway offered the role to King and she accepted it.  Tredway created this role to focus on long-term transformation around processes and data flows instead of day-to-day business operations.  In part, King's new role was to address the historically poor business results of Lane's team by identifying, transforming and improving its business processes.  Before and during her transition, Sommers and Tredway met with King several times to discuss her new role and how she could be successful.  During one meeting, Tredway stated that he was taking a bet on her.  For reasons that are not clear, King interpreted Tredway's statement to mean that she should not raise any concerns about gender disparity.

King had worked with Lane on the 2022 turnaround at Fort Dodge.  During that turnaround, Lane was at the site almost daily, and Lane and King met up to twice a day.  During that time,

---

[2]    A turnaround is a pre-planned period when plants are shut down for maintenance, inspection, repair and upgrade activities that require extensive advance planning and coordination, with significant stress and cost.

King perceived Lane as dismissive, condescending and bullying, even though she "owned" the event controls for the turnaround and Lane was supposed to be a support resource. King did not report her perception to Sommers because Sommers and Lane had a personal relationship: they had known each other for 28 years, Sommers' husband had gone to high school with Lane, Sommers and Lane's wife had been roommates and Sommers and Lane were in each other's weddings.

During the Dodge City turnaround, Fox worked closely with King and Lane and attended daily meetings with them and another KAES employee, Jon Hawk (male). Many times during meetings, Fox observed Lane question King's data insights, lack respect for the information that King contributed and force King to defend the data that she presented. When King expressed a view with which Lane disagreed, Lane would scoff at her. He behaved in a very demeaning manner toward both King and Fox. Lane's behavior toward King did not align with KAES challenge culture, in that he was disrespectful, raised his voice, questioned everything King contributed to the meeting, scrutinized the sources of King's information and generally talked down to King. When King could not attend meetings and Fox presented King's data, Lane engaged in similar conduct toward Fox. King did a good job using challenge culture when she challenged Lane, and she remained professional when doing so. Fox described Lane's behavior toward King as: "fighting. . . not challenge." Fox never saw Lane exhibit these behaviors toward Hawk, who was present during the meetings, or other male employees.

In King's new role, she reported directly to Tredway.[3] King began her new role remotely in November of 2022, and her working relationship with Tredway appeared to be a normal

_____

[3] Tredway's other direct reports were Lane (male), Rick Reisner (male), Ken Dayton (male), Kevin Whitson (male), Allison Dellinger (female Procurement Leader) and Dana Jacobs (male Turnaround Leader).

supervisor-employee relationship.

In her new role, King earned $125,000.00 in base salary—the same base pay she had earned as Finance Leader at Fort Dodge. During the transition, King asked Tredway for a base pay increase since her new role was bigger than that at Fort Dodge. Tredway denied King's request because King's new role was a fleet-wide position versus a site-specific position and King therefore would have the opportunity to earn more Incentive Compensation ("I-COMP").[4]

Although King started her new role in November of 2022, she physically relocated to Wichita in March of 2023. Tredway gave her an office on the third floor and a cubicle on the first floor, in the middle of Lane's Project Controls team. During King's tenure, each male direct report to Tredway had an office on the first floor in close proximity to Tredway. Tredway gave King the cubicle so that she could connect to what was going on in Lane's team and encourage collaboration with his teams. Tredway gave King an office on the third floor so that she could focus on the IT-facing components of her projects in proximity with the IT department, which was on the third floor. King could work on both floors, but after May of 2023, she spent most of her time on the third floor. Her office situation did not impact her ability to collaborate with other KAES employees or otherwise alter any term or condition of her employment.

When King entered her new role, tension with Lane carried forward from Fort Dodge. King felt that Lane was excluding her from meetings with KAES leadership on turnaround outcomes. As Project Controls Leader, Lane owned the project controls capability, but his role intertwined with King's. Lane and King and Lane's team had to collaborate. King had to understand the work of Lane and his team, and vice versa. Lane initially supported King's hiring, believing that she would be his subordinate and report directly to him. He was confused and

---

[4]    KAES refers to its various sites, in the aggregate, as a "fleet."

surprised—and apparently unhappy—when he learned otherwise, i.e. that she was a peer and Tredway's direct report.

To have a cohesive working relationship with Lane, King held meetings and working sessions with Lane's team and tried to be included in team meetings. Though Lane testified that he tried to improve his relationship with King, she believed that he did not reciprocate her efforts to foster a cohesive working relationship. King scheduled recurring one-on-one meetings with Lane, but they only lasted for about two months before King cancelled the series due to Lane's repeated cancelations or failure to show up. Lane testified that the meetings "must have fallen off the calendar."

Shortly after King relocated to Wichita, Lane started to exclude King from key meetings, put himself forward as the primary point of contact and minimize King's contributions. Lane did not have confidence that King understood where his team needed or wanted to go. Even though Lane and King were both direct reports to Tredway, Lane told his team that he "spoke for" King. Lane also reinforced that as Project Controls Leader, he owned the capability and had to be part of all discussions regarding Project Controls.

Lane's demeanor toward King was demanding. She felt that she had to include him in her work streams, seek his approval and run her work product through him.[5] King raised these concerns to Tredway but does not recall having a good follow-up conversation.

King's new role did not have direct reports, but she expected to receive support resources as needed, either through direct reports or support staff. In March of 2023, King informed Lane

---

[5]     At one point, Lane shared one of King's PowerPoint presentations without informing her that he would be using her work. This left King with the impression that she could not own her work product and that Lane taking credit for her work would negatively affect her I-COMP.

and Tredway that she needed support resources to move her workstreams forward. On multiple occasions between March of 2023 and early 2024, King requested resources from Lane's team. Lane refused to allocate resources or otherwise assist King.

By May of 2023, Tredway had not assigned additional resources to King. On May 4, 2023, King emailed Tredway to formally request support staff. She also mentioned that she was excluded from ongoing strategy conversations and that Lane met her directions with conflict. Tredway acknowledged that King's work required a "very manually intensive effort." Tredway did not provide King with additional support resources, however, until late 2023.

On multiple occasions, Lane informed King—sometimes in large group meetings and sometimes in small meetings with King and Tredway—that he needed a working level of detail about King's work. Between May and October of 2023, King participated in meetings with Lane's team and gave updates on her initiatives. She sent out periodic emails on "In Progress Workstreams" which expressly spelled out the status of her projects. Tredway was aware that King was regularly providing updates to Lane and his team.

A few times, Lane questioned why King was present in meetings and told other KAES employees that he did not know what King was working on. Lane interjected himself in her work and interfered with her ability to work directly with other KAES employees, which undermined her credibility. Lane also instructed one of his direct reports to prioritize his initiatives over King's initiatives.

King asked to be included in Asset Performance Management ("APM") meetings, which centered around transformation initiatives that overlapped with her work. APM meetings involved some of Tredway's direct reports, including Lane. Tredway agreed that it made sense for King to participate in the APM meetings but took no action to get her involved. No one added King to the

APM meetings until March of 2023.  Not all of Tredway's direct reports were included in APM meetings, and some APM meetings included King but not Lane.  When King asked Lane to include her in recurring meetings, including APM meetings, he did so.

In the APM meetings, King brought up certain topics of improvement.  In response, Lane would often roll his eyes, laugh at King, question King about why her input mattered, demand that King explain things to him and make statements that King did not understand what she was talking about.  During APM meetings, Lane purposefully asked very detailed questions to show King's lack of knowledge in areas outside her expertise or highlight that King was uncertain of something.  Lane was not the only person who asked King questions, but his conduct created a barrier to King's interactions with other members of his team.

When Lane asked her questions, King did not view it as challenge culture.  Other employees, including Tredway, questioned King to get a better understanding of her work—an example of the challenge process in practice.  As noted, the roles of Lane and King were intertwined, and it was important for Lane to understand King's work because their roles, responsibilities and expectations were overlapping.

During her employment, King kept notes that were a "daily log concept."  Her notes do not include any reference to Lane yelling at her, or any reference to informing Tredway of the same.  King did not observe or have personal knowledge of Lane taking credit for her work; it was just her assumption.

In anticipation of the Dodge City turnaround in August of 2023, King addressed a known gap in planning, led an effort to close the gap and successfully avoided costs associated with planning issues, which created value for KAES.  One of her primary objectives was to roll out a "headcount model" that predicted overspending in turnarounds and aimed at reducing it.  Before

and during the turnaround, King went to Dodge City and presented to Dodge City leadership several areas which forecast overspending. Lane excluded King from his daily Project Controls meetings during the turnaround, despite the fact that her headcount model would have been reviewed in those meetings. Although King's model was "kind of a beta test" which needed refinement and integration during the Dodge City turnaround, it was "very effective." King's data model had accurately projected the information that had to be communicated to Dodge City leadership, but leadership refused to follow her forecast.[6]

After Dodge City, the headcount model was still not ready to use and was in the development phase longer than hoped. KAES remedied many of the issues identified in the Dodge City turnaround before the turnaround in St. James[7] in February of 2024.

By September of 2023, after the Dodge City turnaround, the working relationship between King and Lane had deteriorated to the point that King was uncomfortable attending meetings with him alone. In September, Tredway met individually with King and Lane and asked, "if I was to base your entire incentive comp on how you two were able to collaborate to deliver business results for the business, what would you be doing different?" From his question, King understood that her salary and livelihood were at risk. In light of her prior efforts to collaborate with Lane, King was frustrated by the question and responded that she would quit.

In October of 2023, the mounting tension between King and Lane prompted Tredway to begin holding weekly in-person meetings with the two of them. Within the first few weeks, King

---

[6]    Tredway testified that during the Dodge City turnaround, people were saying that they did not understand King's data, necessitating a more detailed presentation. The data model that King presented to Dodge City leadership was not delivered to them in advance, and King did not explain to leadership the basis of the data and "what the data would be telling them."

[7]    Neither party specifies the state in which St. James is located.

came to believe that the original intent of the meetings was not being met.  Tredway and Lane were asking King to report on all of her work projects and bring a working level of detail to the meetings.[8]  King resented these discussions because in her view, to perform his own work, Lane did not need to understand working-level details of her work.  The constant and unnecessary dissection of King's work led her to believe that Tredway was planning to terminate her employment or otherwise set her up for failure.  Tredway and Lane also disputed what King was working on and refused to recognize progress on her workstreams.  The three had only limited discussion about Lane's workstreams.

The meetings between King, Lane and Tredway had a legitimate business purpose: King and Lane brought different expertise to the same business problem—King in data and IT systems, Lane in business processes—and Tredway needed them to collaborate to obtain better business results.  According to Tredway, the meetings focused on the impact of the data models—a legitimate supervisory purpose.  During the meetings, however, both Lane and King "[put] up walls towards each other."  During this time, Tredway also had weekly one-on-one meetings with King where they discussed her projects at a granular level.

King admitted that after Dodge City, her headcount model was still in the proof-of-concept stage; she described it as testing it out and seeing what they needed to modify in 2023.  Additional information and detail were necessary and her work required data-driven focus, change management, capability development and communication of business changes.  Lane wanted enough information to "champion the initiatives that she was working on" and get buy-in from his

---

[8]    Tredway testified that he did not know why they dissected King's work at the three-way meetings.  Tredway described himself as having "very extensive background, over 30 years of database design, data modeling, and how to take data and leverage it into the business to create business results," and that he understood King's data models.

team.  King acknowledged that the business processes which she sought to change would affect Lane's day-to-day team operations and that Lane and his team had a valid interest in wanting information about her project.

King's performance reviews had previously noted that collaboration and cross-location alignment were "opportunities for development," and noted a need for King to keep stakeholders in the loop and overcommunicate across Project Controls and turnaround teams.

During the weekly meetings between King, Lane and Tredway, Lane would become aggressive.  His face would turn red and he would raise his voice at King.  Tredway testified that King and Lane experienced more tension than most people did.   From King's perspective, Lane became aggressive during their meetings, and Tredway did not stop him.  King discussed the meetings with Tredway, and on October 30, 2023, sent him an email which stated as follows:

> What is not motivating me is this underlying tension on the team → I spent 3 ½ years in [Fort Dodge] dealing with this same type of tension, and now for the last year → tension that is unnecessary and does not create value and is escalating (…) I'd like to have a conversation around this all with you – I walked this road before and I'm hesitant to even bring this all up but I'm not ok and it's overshading [sic] everything for me right now.

Around the time of this email, Tredway was recognizing that King and Lane publicly disagreed a lot with each other.  Tredway saw that King's demeanor during meetings with Lane was different from her demeanor in their one-on-one meetings, but he did not elevate the situation to HR. Tredway testified that nothing in the way they were interacting made it seem like he needed to escalate to HR, and nothing indicated to him that harassment or discrimination was involved.

Soon after King's email, Tredway approached King in her office and stated, "if we can't figure this out, I am going to have to make some changes."  Tredway was extremely frustrated, leaning forward and moving around rapidly, and King could tell that he was giving her a very adverse message.  Tredway testified that he was not considering terminating King's employment,

however, and that he made a very similar comment to Lane. To Tredway, the "whole goal of that conversation . . . was to get alignment" because the dynamic between King and Lane was not sustainable and they were driving different priorities and visions. Tredway did not intend his comment as a threat of termination but was thinking that if King and Lane could not come to agreement, he might need to make business decisions himself or consider reporting changes because the existing path was unsustainable and change needed to happen. As noted, Tredway had the same conversation with Lane.

By November of 2023, the working relationship between King and Tredway was very tense. Tredway's demeanor toward King was very curt. His feedback on King's work product was positive, however, and in their one-on-one meetings, he did not give King negative feedback about her collaboration style. In the last week of November, Tredway informed King that her I-COMP would be $30,000.00 lower than in the prior year because KAES business results were down.[9]

One of King's workstreams required her to collaborate with Lane and Dan Carpenter, Director of IT Operations Enablement. Carpenter testified that the interactions between King and Lane could get "quite spirited:" King "had a pretty good idea of what she thought would add the most value and how she should go about that" and Lane had "a lot of questions."

King maintained good working relationships with colleagues other than Lane and regularly sought their input, advice and guidance.

As a result of Lane's behavior and Tredway's acquiescence in it, King was concerned for her job and well-being, struggled to sleep and worked long hours to prepare for her meetings with

---

[9]    Tredway's reasoning did not make sense to King because she thought her contributions should have increased her I-COMP.

Lane and Tredway.  King spoke to Fox, her co-worker at Fort Dodge, about what she was experiencing in Wichita.  King was emotional at times and tried not to cry.  Her mental and emotional condition devolved to a very poor state, and King believed that she had made the wrong decision for her family in accepting her new role.  King was the primary earner and was especially concerned about losing her job.

In November of 2023, King met with HR Director Justin Klooz to discuss her relationship with Tredway, Lane and others on her team.  King claims that she told Klooz that she believed she was being treated differently because she was a woman, but Klooz denied her claim and testified that King never expressed concerns to him about gender discrimination or harassment.  Klooz testified that the meeting with King was a "generally very positive meeting," with King focused on how to better leverage PBM in her role.

As of December of 2023, King did not believe that her meetings with Lane and Tredway had resolved any of the issues and that if anything, they had worsened the situation.  She was not happy in her work environment and other than the meetings, Tredway was taking no action to address the issues between King and Lane.[10]  In December of 2023, King believed that Tredway had aligned with Lane's narrative about her and that her job was at risk.

On February 4, 2024, King submitted a complaint to the KAES corporate GuideLine platform, claiming harassment, discrimination, retaliation and disparate pay practices based on sex.  Eleven days later, on February 15, 2024, King resigned, effective immediately.  Her resignation letter stated as follows:

> The impacts to me based on the discriminatory actions of those around me are severe, with the most recent related to my ability to provide for my family due to a

---

[10]    Tredway testified that he recognized the tension between King and Lane and took affirmative steps to address it: by establishing the King/Lane/Tredway meetings, providing coaching to both King and Lane and attempting to facilitate collaboration.

> significant pay decrease, ongoing stress from the environment I've had to navigate, being humiliated in front of groups of people, and not being valued for what I bring to the organization. As such, it is apparent that resigning from my role is necessary for my well-being.

This letter gave KAES its first explicit notice that plaintiff had concerns about sex discrimination or harassment. King resigned because of monetary concerns[11] and perceived threats to her job security, because the environment was "no longer suitable" for her. Before submitting her GuideLine complaint, King had accepted another job at a substantially higher salary and knew that she would be leaving KAES within two weeks.

At the time King resigned, she was actively working on multiple concurrent workstreams beyond the headcount model, including "a work order matter" and "a system called Shield," in addition to other projects. Tredway wanted King to remain on his team and had no intention of ending her employment. Her abrupt departure, without prior notice, shortly before a turnaround, left KAES in the lurch.

KAES assigned Chelsea Creech to investigate King's GuideLine complaint. During Creech's interview with King, she recounted a recent instance in which Lane made a subordinate (a woman) cry. Creech interviewed that subordinate on February 20, 2024. After King had resigned, the subordinate had offered a solution to an issue concerning King's headcount model. Tredway and Lane brushed her to the side, Lane "bulldozed" into the meeting, "talked at" the subordinate and made her cry. The subordinate thought that Lane lacked leadership skills and described the conversation as belittling and condescending. During his interview with Creech, Lane—citing good relationships with Dayton and Jacobs—acknowledged that he can come off as "blunt and passionate," but stated that it depended on the relationship.

---

[11]    King generally liked her work and did not begin searching for jobs until November of 2023, when she learned that she would receive $30,000 less in I-COMP than in the prior year.

After King resigned, Creech completed her investigation and found that King's claims were unsubstantiated.  As a result of the investigation, however, KAES coached Tredway on being more involved, ensuring confidentiality of compensation conversations and elevating concerns in a more timely and effective manner.[12]

King never informed Tredway that Lane was harassing her or that she was being discriminated against because of sex.  Lane was not aware of any such allegations until his conversation with Creech, which "took [him] completely off guard."

On June 11, 2024, King filed a charge with the Equal Employment Opportunity Commission and the Kansas Human Rights Commission, and on October 31, 2024, she received a Notice of Right to Sue.

## Conclusions Of Law

At trial, King claimed that (1) defendant subjected her to a hostile work environment, (2) defendant subjected her to disparate treatment based on the way Lane treated her and (3) Tredway retaliated against her by requiring her to provide a working level of detail and threatening her employment.  King asserts identical claims under both Title VII and the KAAD. Because the same standards and burdens apply to claims under Title VII and the KAAD, the Court's analysis applies to both claims.  See Watson v. City of Topeka, 241 F. Supp. 2d 1223, 1230 (D. Kan. 2002) (hostile work environment); Singh v. Cordle, 936 F.3d 1022, 1042 (10th Cir. 2019) (retaliation).

## I.    Hostile Work Environment

To establish a prima facie case of hostile work environment, plaintiff must prove that (1) she is a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the

---

[12]    Tredway denies receiving any such coaching.

harassment was based on the protected group and (4) the harassment was so severe or pervasive that it altered a term, condition or privilege of employment. Semsroth v. City of Wichita, 304 F. App'x 707, 721 (10th Cir. 2008). A hostile work environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). "An employer creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Iweha v. State of Kan., 121 F.4th 1208, 1221 (10th Cir. 2024). Plaintiff must prove that her work environment was both subjectively and objectively hostile. Throupe v. Univ. of Denver, 988 F.3d 1243, 1252 (10th Cir. 2021). To make this determination, the Court looks at the totality of the circumstances and considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Whether a hostile work environment exists "is not, and by its nature cannot be, a mathematically precise test." Id. at 22. Rather, it "depends not only on the number of incidents, but also on the severity of the incidents." Tademy v. Union Pac. Corp., 614 F.3d 1132, 1143 (10th Cir. 2008). Whether a work environment is hostile is disjunctive—pervasiveness and severity are independent and equal grounds on which plaintiff can support her hostile work environment claim. Lounds v. Lincare, Inc., 812 F.3d 1208, 1222 (10th Cir. 2015).

On summary judgment, the Court ruled that plaintiff did not experience sufficiently severe conduct to support a hostile work environment claim. Therefore, at trial, plaintiff had to prove that the alleged harassment was both (1) unlawfully pervasive and (2) based on sex. Semsroth,

304 F. App'x at 721.

If the nature of an employee's environment, however unpleasant, is not due to gender, it does not implicate Title VII. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1537 (10th Cir. 1995). Plaintiff need only put forth evidence that sex was a motivating factor for defendant's conduct. Little v. Gray Media Grp., Inc., 790 F. Supp. 3d 1195, 1222 (D. Kan. 2025). Facially sex-neutral conduct can only support a finding of gender animus when it is "overtly gender-discriminatory conduct." Throupe v. Univ. of Denver, 988 F.3d 1243, 1251 (10th Cir. 2021).

To prove pervasiveness, plaintiff must subjectively and objectively perceive the harassment. Ford v. Jackson Nat'l Life Ins. Co., 45 F.4th 1202, 1228 (10th Cir. 2022) (citing Throupe, 988 F.3d at 1252). In other words, plaintiff must (1) subjectively perceive the conduct as pervasive and (2) convince a rational fact-finder that the workplace is permeated with discriminatory intimidation, ridicule and insult. Id.

Plaintiff claims that Lane subjected her to a hostile work environment when he (1) yelled at her for not knowing what was going on during the 2022 Fort Dodge turnaround, (2) automatically assumed that she would be his subordinate, (3) refused to reciprocate her efforts to foster a cohesive working relationship by cancelling or not showing up for one-on-one meetings in Wichita, (4) refused to go to the third floor to collaborate with her, (5) repeatedly questioned and forced her to defend her data insights in front of other employees, despite her being better versed in data than he, (6) scoffed at her in front of other employees when she engaged in challenge culture with him, (7) excluded her from meeting after meeting, including meetings which involved her initiatives and despite her repeated requests to be included, (8) repeatedly questioned why she was present in certain meetings or why she was even there at all, (9) repeatedly interjected himself into her work and interfered with her ability to work with other KAES employees directly,

(10) shared and presented her work product in such a way that made it appear to be his work product or without crediting her, (11) minimized her work as this "data stuff," (12) stated that he "spoke for" King, (13) baselessly demanded an unnecessary working level of knowledge about the details of her work, (14) withheld resources, de-prioritized her initiatives to his subordinates and met with conflict her efforts to utilize resources from his team, (15) rolled his eyes at her, laughed at her, questioned why her input mattered and made statements in front of other KAES employees that she did not know what she was talking about when she would bring up topics of improvement during meetings, (16) purposefully asked her very detailed questions in front of other KAES employees in an effort to highlight areas where she lacked expertise, (17) with no purpose other than to undermine her, went to other employees and alleged that he did not understand her work and that he did not know what she was working on, (18) refused to direct other employees to her when they had legitimate questions about her work or within her expertise, (19) refused to recognize her work progress during King/Lane/Tredway meetings, (20) exhibited confrontational and aggressive behavior toward her during those meetings, (21) demanded to know the intimate minutia of her work either to pass it off as his own or so that she could be terminated or otherwise set up for failure, (22) expressed frustration that she did not seek his approval on her work and (23) attempted to craft a narrative amongst KAES employees that she was not collaborating, not sharing information and was difficult to work with, thereby undermining her credibility and initiatives.[13]

---

[13]    In the Pretrial Order (Doc. #63) filed February 6, 2026, King alleged that Lane subjected her to a hostile work environment shortly after she began her new position, so his behavior before that time cannot form the basis of a hostile work environment claim. See Sunderman v. Westar Energy, Inc., 520 F. Supp. 2d 1269, 1278 (D. Kan. 2007). Also, though plaintiff cites evidence that Lane automatically assumed that King would be his subordinate, the record does not reflect that she was aware of such assumption. Hirase-Doi v. U.S. W. Commc'ns,

(continued. . .)

As a woman, King is a member of a protected class.  Plaintiff claims that Lane's behavior was motivated by sex because he demonstrated a pattern of hostility toward her, a female leader who not only challenged Lane personally, but whose entire role was designed to cure the historically poor performance of his team.  Plaintiff claims that Lane's conduct was rooted in gender-based expectations regarding how women in professional leadership roles should behave and is an embodiment of chauvinistic behavior that women often face in the workplace.

King does not allege overtly gender-discriminatory or sexual behavior.  Indeed, the record does not reflect that anyone made gendered statements or engaged in sexual conduct, or that anyone except Lane created a hostile work environment for plaintiff.

The Court has no doubt that King believed that Lane's conduct was permeating her workplace with discriminatory intimidation, ridicule and insult.  Ford, 45 F.4th at 1228.  Under an objective standard, however, the Court looks to the totality of the circumstances and considers (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, or a mere offensive utterance and (4) whether it unreasonably interfered with plaintiff's work performance.  See Harris, 510 U.S. at 23.  As to frequency, it is not clear that Lane was harassing King every day or every other day.  Much of the harassment which plaintiff describes occurred during meetings with Lane, and those meetings occurred weekly near the end of 2023 and into 2024.  Lane's conduct was not severe or physically threatening.  It was objectively humiliating, but it did not unreasonably interfere with King's work performance.  In fact, plaintiff was performing well, and Tredway valued her work.  Though it is a close question, the Court finds

---

[13] (. . .continued)
Inc., 61 F.3d 777, 782 (10th Cir. 1995) (plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment").  Many of King's remaining allegations are either unsupported or contradicted by the record.  The Court only considers the allegations which it has included in its findings of fact.

that a reasonable person would not find that Lane's harassment was pervasive to the extent that it permeated King's entire workplace with discriminatory intimidation, ridicule and insult. King basically had serious conflict with one peer, who mostly worked on a different floor, with whom she had regular but intermittent contact.

Moreover, plaintiff has not persuasively shown that Lane's conduct was because of her sex. See Maccagnan v. Cherry Creek Sch. Dist. No. 5, No. 25-1335, 2026 WL 2066706, at *23 (10th Cir. July 17, 2026) (plaintiff must provide more than her own conclusory belief that words connote stereotyping; employee's subjective belief in a comment's invidious nature does not support inference of discriminatory intent). The Court agrees that Lane was hostile to plaintiff, and that he reacted poorly to the news that she was not his subordinate and that her role had been created to remedy deficiencies in his team's performance. Lane admitted that he could come off as blunt and "passionate," which has various meanings such as, "Mother Teresa was passionate about caring for the poor." It can also be a euphemism for hot-headed, rude, disrespectful, short-tempered, bullying, territorial and qualities which King observed. At a minimum, it seems fair to say that Lane had intense feelings about his work and his team, which he considered important, and to which he devoted significant time and energy. In that same sense, King was equally passionate. She was strong-willed, outspoken and ambitious, and Tredway was obviously not up to the task of managing the conflicting missions and agendas of Lane and King. They had a personality conflict which Tredway failed to effectively manage, let alone resolve. On top of the personality conflict, the relationship between Lane and King was structurally ill-conceived from the outset: they shared project responsibilities and unclear lines of authority—issues which Tredway also failed to effectively address. Lane and King got off on the wrong foot because he was expecting that King would report to him, when Tredway actually brought King in as Lane's

peer to improve his team, which Tredway viewed as inefficient. A reasonable person in King's position would find Lane's conduct hostile and demeaning, but not on account of her sex or gender-based expectations or stereotypes.

For these reasons, King has not shown that she suffered a pervasive hostile work environment.

## II.    Disparate Treatment

To establish her sex discrimination claim, plaintiff must show that (1) she is a member of a protected class; (2) she suffered some harm with respect to an identifiable term or condition of employment; (3) she was qualified for her position; and (4) defendant treated her less favorably than others not in her protected class. Muldrow v. City of St. Louis, Mo., 601 U.S. 346, 355 (2024); McNellis v. Douglas Cnty. Sch. Dist., 116 F.4th 1122, 1139 (10th Cir. 2024).

As a woman, King is a member of a protected class and was qualified for her position. At trial, King testified that Lane's actions affected multiple terms and conditions of her employment in that they interfered with her ability to perform her job. She cited (1) Lane refusing to reciprocate her efforts to foster a cohesive working relationship by cancelling or not showing up for one-on-one meetings, (2) Lane refusing to go to the third floor to collaborate with her, (3) Lane repeatedly questioning and forcing her to defend her data insights in front of other employees, (4) Lane excluding her from meeting after meeting, (5) Lane repeatedly questioning why King was present in certain meetings or why she was even there at all, (6) Lane withholding resources from her, (7) Lane de-prioritizing her initiatives to his subordinates and (8) Lane meeting her efforts to utilize resources from his team with conflict.

Lane did not subject his other colleagues, male or female, to such behavior. Still, King did not identify how Lane adversely affected terms or conditions of her employment. For all that the

-22-

record suggests, plaintiff was satisfactorily performing all of her duties until the day she quit without prior notice, and Lane's behavior, while obnoxious and demeaning, did not alter the terms or conditions of her employment.

Thus, plaintiff failed to prove her disparate treatment claim.

## III.    Retaliation

To establish her retaliation claim, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) she suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection exists between her protected activity and the adverse action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Mauldin v. Driscoll, 136 F.4th 984, 995 (10th Cir. 2025); Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018).

Although no magic words are required to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by Title VII.  Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1203 (10th Cir. 2008). Generic reports of tension in the workplace do not amount to protected activity.  See Sanders v. TC Transcon. Tulsa, No. 25-5022, 2026 WL 1256902, at *5 (10th Cir. May 7, 2026).

While Muldrow altered the standard for Title VII discrimination claims, it distinguished adverse employment action in the context of Title VII retaliation claims.  Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 357 (2024).  Though the Supreme Court purported to lower the bar for adverse employment action in discrimination cases, it reaffirmed that in retaliation cases, plaintiff must still show that the retaliatory action caused a "significant" harm, i.e. the employer took action serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination.  Id.; White, 548 U.S. at 68.

Plaintiff may show a causal connection by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982).

Two retaliation claims remained for trial: King's claim that Tredway retaliated for her protected activity by (1) requiring that her work product be at a working-level of detail and (2) threatening her employment through his comment about possibly needing to make changes.[14]

Plaintiff argues that she engaged in protected activity when she (1) sent Tredway an email on October 30, 2023, complaining about the type of tension that she had experienced at Fort Dodge and (2) met with Klooz in November of 2023 to discuss interpersonal issues with Lane and Tredway.  From the trial record, it is far from clear that either of these acts constitute protected activity.  King's email to Tredway did not mention discrimination or gender-related issues.  In her email, King complained of "underlying tension on the team" which was the "same type of tension" that she experienced at Fort Dodge.  King argues that even though her email made no mention of gender or discrimination, Tredway knew that she had complained about gender disparity in hiring decisions at Fort Dodge and therefore he would have known that her email was complaining about gender discrimination.  This argument is unpersuasive.  Plaintiff has not proven that her email on October 30 constituted protected activity.

King testified that at a meeting in November of 2023, she complained to Klooz about gender discrimination.  Klooz denied that King complained of or even mentioned gender

---

[14]   At trial, plaintiff testified about Tredway (1) exhibiting a tense and curt demeanor toward her, (2) intensifying the degree of detail that she provided at meetings and (3) treating meetings as an interrogation.  The Court, however, limits its analysis to the retaliation claims which King included in the pretrial order and that survived summary judgment: Tredway requiring that plaintiff's work product be at a working-level of detail and threatening her employment through his "changes" comment.

discrimination, and it is unlikely that she did so.  At most, King may have hoped that Klooz would read between the lines of their discussion about PBM and deduce that she had concerns about gender discrimination. [15]  Moreover, even if she engaged in protected activity in the meeting,  King has not shown a causal connection to any adverse action.

King met with Klooz in November.  Plaintiff argues that she suffered adverse action when Tredway (1) began requiring a working-level of detail and (2) threatened her employment by stating that he would have to make some changes if she and Lane could not get along.  Beginning in September of 2023, however, King was having meetings with Tredway and Lane, and was, during the first few weeks of those meetings, bringing a working level of detail.  Thus, King met with Klooz *after* Tredway was requiring a working-level of detail, so no causal connection exists.

When Tredway told her that if she and Lane could not figure something out, he would have to "make some changes," it was a day or two after she sent her email on October 30, 2023, i.e., on October 31 or November 1.  The trial record is unclear on the exact date of King's meeting with Klooz, but King has not proven that it occurred on November 1.  Thus, the meeting almost certainly occurred *after* King's conversation with Tredway.  Further, the record does not indicate that Tredway knew about King's meeting with Klooz, so no causal connection exists.

Accordingly, plaintiff failed to prove retaliation by Tredway.

**IT IS SO ORDERED**.

---

[15]     Plaintiff was nothing if not ambitious, savvy about career advancement and well-informed on the legal rights available to her as a member of a protected class under federal employment law.  At the time of her conversation with Klooz, she knew that her work environment was full of conflict and she feared that her job was in jeopardy, but she had not secured a different job.  More likely than not, in her conversation with Klooz, King was trying to (1) avoid rocking the boat by engaging in express protected activity before she had developed an exit strategy, yet without tipping her hand (2) plant the seeds of a potential retaliation claim under Title VII.  Her claim that she engaged in protected activity in the meeting is simply not credible.

-26-

The Court directs the Clerk to enter judgment in favor of defendant.

Dated this 10th day of August, 2026 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
